# Arthur O. Slaughter and William V. Baker v. Charles Norman Fay.

1. FRAUD—*Where One of Two Innocent Persons Must Suffer.*— Where one of two innocent parties must suffer a loss by reason of the dishonesty of a third person, the loss must fall upon the one who has been the most instrumental in placing such third person in a position enabling him to successfully practice the dishonesty.

2. COMMERCIAL PAPER—*Forged Indorsements.*—Where the name of a payee in a check is forged as indorser, the money called for by the check can not be legally obtained thereon from the drawee, and the payee can not be injured by such forgery.

3. CHECKS—*Operate as Assignments of Funds, etc.*—A bank check, in the form of those under consideration in this suit, operates as an assignment to the payee of so much of the drawer's money then in the drawee's hands as is named in the checks.   And such money can be procured only by the direct and affirmative act of the payee named in the check.

4. SAME—*Assignment by Agents.*—So far as the drawer of a check is concerned, it is immaterial whether the act of assigning it is by the payee personally or by another duly authorized to perform such act.

5. PRINCIPAL AND AGENT—*Powers of Attorney to be Strictly Construed.*—A power authorizing an attorney to indorse checks for deposit in a certain trust company does not authorize such attorney to indorse checks for deposit in any other place or to any other party.

6. SAME—*Principal—When Bound for the Wrongful Act of Agent.* —The principal is liable for the wrongful or fraudulent act of the agent if committed within the scope of his authority.

7. REMEDIES—*Actions for Money Had and Received.*—The action for money had and received may be maintained whenever the defendant has obtained money of the plaintiff which in equity and good conscience he has no right to retain.

8. BANKS AND BANKING—*Duty in Drawing Checks.*—Where a banker draws a check payable to the order of a party and delivers it to his agent, no duty rests upon the banker to follow the check and see that it is properly indorsed before it is negotiated.

9. ESTOPPEL—*To Deny an Agent's Act.*—Where a person authorizes his agent to indorse a check, which he does, and the act is within the scope of his authority, such party is not permitted to say that he is not liable for the acts of his agent because the authority was intended only to apply to checks received by the agent in the proper management of his business, and that his agent willfully perverted the power vested in him to do something more than was designed or intended.

Assumpsit, to recover money deposited in defendant's bank. Trial in the Superior Court of Cook County; the Hon. PHILIP STEIN, Judge,

presiding. Verdict and judgment for defendant by direction of the court. Appeal by plaintiffs. Heard in the Branch Appellate Court at the March term, 1898. Reversed and remanded. Opinion filed January 24, 1899.

### STATEMENT.

In June, 1894, appellee was the owner of a so-called installment receipt issued by the Chicago Edison Company, which, on payment of the installments, and on surrender of the receipt, entitled him to 200 shares of the capital stock of the Edison Company. On the 23d day of June, 1894, being about to go East for the summer, appellee executed a power of attorney, of which the following is a copy, to one Charles E. Anderson, who was, then and there, and for some time had been his private and confidential clerk:

" Know all men by these presents, that I do hereby make, constitute and appoint Chas. E. Anderson to be my true and lawful attorney, for me and in my name, to draw checks, bills of exchange and drafts, and make orders and overdrafts upon the Northern Trust Company of Chicago; and in my name to indorse checks, drafts, bills of exchange, notes and orders for deposit in said Northern Trust Company, hereby confirming all that my said attorney shall do under above authority."

Appellee at this time was interested in several corporations. Anderson collected appellee's rents and paid his bills, and was the only person having anything to do with his business, except appellee himself. When appellee left for his summer vacation he intrusted to Anderson the custody of the installment receipt referred to. He left with his brother-in-law, Wilmerding, who was the general superintendent of the Edison Company, a power of attorney to surrender the installment receipt on its full payment and to receive the stock. Anderson, under instructions from appellee, drew checks on appellee's bank for the different installments which became due after appellee's departure, and on the 7th of August, 1894, all the installments having been paid, Wilmerding executed a document surrendering the installment receipt. Two certificates of stock numbered 1334 and 1335 for 100 shares each, were, by Wilmerding's

direction, delivered by the Edison Company to Anderson. Anderson was implicitly trusted by appellee. He was left in charge of appellee's office at Chicago, and of his business during the whole of that summer and until appellee's return in October. Appellee had, prior to this time, bought and sold stocks and bonds upon the Chicago Stock Exchange through appellants, who were bankers and brokers at Chicago, and had become acquainted with Anderson as appellee's private secretary or business agent. Anderson had brought to appellant's office some stocks, the sale of which appellee had arranged for. Anderson had also received from appellants, various stocks purchased by them for appellee.

Appellee, as stated, left Chicago about the 23d day of June, 1894, after executing the power of attorney above referred to. He did not return to Chicago until the 8th or 9th of October. In the meantime he trusted his whole business and affairs to Anderson.

September 12, 1894, Anderson had a telephone conversation with Mr. Baker, one of the appellants, informing him that appellee wanted to sell some Edison stock, and asked what price appellants could get for it on the Chicago Stock Exchange. Baker inquired and reported that it was offered at $125 per share. Anderson said he didn't think appellee would sell at that price, but he would wire him at his summer residence in the East and would let Baker know the result. The next day (September 13th) Anderson telephoned Baker that he might sell fifty or 100 shares at the market price; and appellants then sold fifty shares at the then market price ($123 per share), and gave Anderson a check, payable to the order of appellee, for $6,137.50, which was the amount of the sale, less their usual commissions. This check was by Anderson indorsed in appellee's name and deposited in the Northern Trust Company and credited to appellee's account in that bank. On the day of the first conversation with Baker, Anderson sent over to appellants' office certificate numbered 1335 for 100 shares, bearing upon its back an assignment purporting to have been made by

appellee, but which in fact was a forgery. This certificate was sent to the Edison Company's office by appellants and split up into two new certificates, each for fifty shares, which were delivered to appellants by the Edison Company, one of which was transferred to the party to whom the fifty shares had been sold, and the other was retained by appellants. September 14th Anderson again telephoned appellants, inquiring whether the remaining fifty shares had been sold, to which Baker replied no; that he could not get the same price that the first fifty shares had been sold for. Anderson then said that appellee needed money and arranged for a loan of $6,000 upon it. Upon this loan appellants gave a check for $6,000, payable to appellee's order. This check also was indorsed by Anderson in appellee's name and deposited to appellee's credit with the Northern Trust Company. September 25th Anderson telephoned appellants that appellee was in need of more funds, and did not want to sell the stock at the previous price, and asked if appellants would make another loan, for which he would send over another certificate for 100 shares. Baker asked how much was wanted. Anderson replied $8,000. Baker said that was all right, and so Anderson sent over the other certificate (No. 1334) for 100 shares, and on the same day (September 25th) appellants gave him a check for $8,000, which check was also made payable to appellee's order and was by Anderson indorsed in appellee's name and deposited to his credit with the Northern Trust Company.

October 4th an additional advance of $2,000 was made upon the 150 shares then in appellants' hands. This was also arranged by telephone and a check for $2,000 to appellee's order was given, and was also deposited to appellee's credit with the Northern Trust Company. In arranging for this loan Anderson told Baker that this $2,000 was all appellee wanted, and that would be final.

October 8th, by Anderson's direction, appellants sold twenty-five shares at $120, and credited appellee's account with the proceeds, $2,987.50.

The foregoing comprise all the transactions between Anderson and appellants.

The second certificate was also sent by appellants to the Edison Company and split up, and the new certificates were delivered to appellants by the Edison Company. One of them, being for twenty-five shares, was transferred to the purchaser, and the remaining 125 shares were held by appellants as security for their loans.

Appellants did not know of the power of attorney which had been executed by appellee to Anderson. They had no reason to suppose that the money could be drawn out of appellee's bank, except by appellee's own check. Appellee returned to Chicago about October 9th, and found at his office a statement from appellants of the sale of the twenty-five shares, whereupon he called at appellants' office for an explanation. Baker then furnished him a full statement of appellants' transactions with Anderson, and appellee thereupon stated to Baker that his signature had been forged. Appellee at once went to the Northern Trust Company, revoked Anderson's power of attorney, and had his account written up. He checked upon the bank statement, in red ink, such of Anderson's deposits and checks as he claimed had been legitimately made for him by Anderson. As to the balance of the deposits, he testified that he knew nothing about them, and that the balance of the checks were not drawn for any of his purposes, and there were no business transactions of his to which these items could have been applicable. He had Anderson arrested and sentenced for larceny. After being transferred to the hospital on the plea of sickness Anderson escaped, and has ever since remained a fugitive. He was never indicted for forgery.

October 19, 1894, appellee filed a bill in the Superior Court of Cook County against the Chicago Edison Company, seeking reinstatement as the holder of the 200 shares of stock which had been transferred by the Edison Company upon the forged indorsements, and for the issuance to him of new shares evidencing such ownership. In that suit appellee obtained a decree for the issuance of such new stock, and in accordance therewith new certificates were issued to him, and the dividends which had in the mean-

time accrued on the old stock were paid to him. (62 Ill.
App. 55, and 164 Ill. 323.) After that decree appellants
delivered to the Edison Company 200 shares in place of the
certificates in question, and also paid the company the
accrued dividends upon such shares, with the interest
thereon. This action was brought by appellants against
appellee to recover the different sums which had been
deposited in appellee's bank by Anderson upon the transac-
tions in question.

The undisputed evidence showed that during August
Anderson had checked and drawn out of appellee's bank
account, for purposes which appellee called illegitimate,
$2,950, and had deposited $1,000 obtained from some source
as to which appellee also was in ignorance.

By the end of September Anderson had replaced out of
the money received from appellants $2,775. The net
amount of his embezzlements from the first to the sixth of
October was $950. With the money received from appel-
lants and deposited to appellee's credit, and with appellee's
own money, he had a balance to his credit on every day
from September 13th up to the end of that month, and was
not overdrawn until October 4th, which was after Ander-
son embezzled the $950. This overdraft was also made
good by the deposit of appellants' last check for $2,000
October 5th.

The court directed the jury to find a verdict for appellee
and refused to give to the jury the instructions which were
asked by appellants, or to pass upon such instructions or
either of them, or to mark the instructions or either of them
" refused," to all of which rulings the appellants excepted.

The jury in obedience to this direction found a verdict in
favor of appellee. Appellants moved for a new trial, which
motion was overruled and an exception noted and judgment
was entered upon the verdict, from which judgment this
appeal is prosecuted.

ULLMANN & HACKER and WILLIAM H. SWIFT, attorneys
for appellants, contended that where one of two innocent

parties must suffer a loss by the fraud or wrong of a third party, the one who put it into the power of such third party to commit such fraud or wrong must bear the loss. Mechem on Agency, Sec. 739; Yeck v. Crum, 122 Ill. 268; Hern v. Nichols, 1 Salk. 289; Griswold v. Haven, 25 N. Y. 595; Mechanics Bank v. N. Y. & N. H. Ry. Co., 13 N. Y. 599.

"The scope of an agent's authority can not properly be restricted to what the parties intended in the creation of the agency, for that would also exclude negligence, as no agent is appointed for the purpose of being negligent, any more than for the purpose of acting fraudulently. The question can not be determined by the authority intended to be conferred by the principal. We must distinguish between the authority to commit a fraudulent act and the authority to transact the business in the course of which the fraudulent act was committed." Reynolds v. Witte, 13 So. Car. 5; T., W. & W. R. R. Co. v. Harmon, 47 Ill. 298; Mulvehill v. Bates, 31 Minn. 364; Southern Express Co. v. Jasper Trust Co., 99 Ala. 416.

The rule is familiar, that a person who knowingly allows another person's property to be mixed with his own, so that the property of such other person can not be distinguished, must bear the whole loss. Beach v. Schmultz, 20 Ill. 185; Fuller v. Paige, 26 Ill. 358; Diversey v. Johnson, 93 Ill. 547; First Natl. Bk. v. Schween, 127 Ill. 573.

"The action for money had and received is supported without any privity between the parties other than that which is created by law. Whenever one man has in his hands the money of another which he ought to pay over, he is liable to this action, although he has never seen or heard of the party who has the right. When the fact is proved that he has the money, if he can not show that he has legal or equitable ground for retaining it, the law creates the privity and the promise." Hall v. Marston, 17 Mass. 575; Pierce v. Crafts, 12 Johns. 90; Taylor v. Taylor et al., 20 Ill. 650; Chitty on Pleading, Vol. 1, 353.

Anderson's authority under the power was strictly analogous to that of a partner. He had a right to draw for appellee's use, and he had a right to draw for his own use to the extent of the appellee's indebtedness to him. Each

partner is the agent of the firm, and the firm is liable for his torts committed within the scope of his agency. Bates on Partnership, Vol. 1, Sec. 461; Tenney v. Foote, 95 Ill. 99; Wiley v. Stewart, 122 Ill. 545.

If one of the partners converts to his own use property in the possession of the firm, all the partners are liable. Even if the partner who converts the property improperly procured it and placed it in the custody of the firm in order that he may have the opportunity of converting it to his own use, the firm is liable. This was decided in several cases arising out of the notorious Fauntleroy forgeries, which occurred in London in the year 1819. Marsh v. Keating, 2 Clark & Fin. 250.

WILLIAMS, HOLT & WHEELER, attorneys for appellee, contended that the mere unauthorized deposit of money in Fay's bank account, from which it was withdrawn before he knew it was there, did not make it his money or render him liable to the depositor. Bank of Las Vegas v. Oberne, 121 Ill. 25; Andrews v. Ætna Life Ins. Co., 92 N. Y. 596, 604; Story on Agency, Sec. 248; 1 A. & E. Encyc. (2d Ed.), 1193.

This is not a case between " two innocent parties." It was Slaughter, and not Fay, who put it into the power of Anderson to steal the money. Bank of Las Vegas v. Oberne, 121 Ill. 25; Penna. Co. v. Franklin Ins. Co., 181 Pa. 40; Hurley v. Watson, 68 Mich. 531.

Anderson's dealings with the stock were not within the scope of his actual or apparent authority. Bank of Las Vegas v. Oberne, supra, 121 Ill. 25; Rawson v. Curtiss, 19 Ill. 456, 474–5; Mechem on Agency, Secs. 276, 288, and cases cited; Baxter v. Lamont, 60 Ill. 237; Peabody v. Hoard, 46 Ill. 242; Wharton on Agency, Sec. 139; Davidson v. Porter, 57 Ill. 300, 305; Law v. Stokes, 3 Vroom, 249; 1 A. & E. Encyc. (2d Ed.), 989, and cases cited; Edwards v. Dooley, 120 N. Y. 540; Griswold v. Haven, 25 Id. 595.

No part of the unauthorized deposits was used for Fay's benefit, or remained subject to his control when he learned of the frauds.

(1)   The money was actually all gone.

(2)   Anderson's supposed prior embezzlement ˙from Fay does not make Fay liable to Slaughter for the amount of such prior defalcation.   Atlantic Bank v. Merchants' Bank, 10 Gray, 532; Atlantic Cotton Mills v. Indian Orchard Mills, 147 Mass. 268; Baldwin v. Burrows, 47 N. Y. 199; Hastings v. Bangor House Prop., 18 Me. 436; In re Ketchum, 1 F. R. 815, 830, 832, 833; Bohart v. Oberne, 36 Kas. 284; Spooner v. Thompson, 48 Vt. 259; Thatcher v. Pray, 113 Mass. 291; Pope v. Lowitz, 14 Ill. App. 96.

(3)   No part of the Slaughter money is shown to have been actually paid out for Fay's benefit.   Moses v. McFarlan, 2 Burr. 1012; Supervisors v. Manny, 56 Ill. 160.

MR. JUSTICE HORTON delivered the opinion of the court.

In this case there is but very little, if any, conflict in the testimony as to any material fact.   The two stock certificates delivered by Anderson to appellants were in the name of appellee.   There is no question but that the indorsement thereon of the name of the appellee was a forgery.   Appellants did not pay Anderson in currency or in checks to his order, but gave him in payment for said certificates their checks *payable to the order of appellee.*   There were four such checks, given at different times, amounting to the sum of $22,137.50.

During all the period covering the transactions in question, appellee was absent from Chicago and Anderson attended to all his business there.   By the power of attorney which appellee gave to Anderson, the latter was authorized to indorse checks in the name of appellee *"for deposit* in said Northern Trust Company," being the bank where appellee made his deposits.   Anderson was not authorized to indorse checks payable to the order of appellee for any purpose except to deposit the same in said bank.   He could not have used either one of appellants' checks in any way except to deposit it in that bank to the credit of appellee. Each and every one of the four checks in question was payable to the order of appellee by the name C. N. Fay, and

had thereon the indorsement, "For deposit, C. N. Fay." All of said checks, thus indorsed, were deposited in said bank, and the amount thereof passed to the credit of appellee.

Had the name of appellee been forged as indorser upon those checks, the money of appellants could not have been legally obtained thereon, and they would not have been injured thereby. But the indorsement was not a forgery. It was put there by one authorized by appellee to do it, and hence was, in law, the act of appellee himself, as fully as though he had personally performed the physical act of writing his name upon the back of the checks.

At the time said checks were given, appellants were not aware of the fact that Anderson held said power of attorney. There were no dealings between appellants and appellee after said power of attorney was given to Anderson, except the transactions in question. Appellants, therefore, had no reason to suppose that Anderson was in a position such that he could embezzle the money represented by said checks, or that such money could be obtained by any one or in any manner except by appellee personally. Anderson was put in that position by appellee. It was only by reason of the confidence reposed in him, and the authority vested in him by appellee, that Anderson was enabled to steal appellee's money, or any part thereof. Appellants in no manner authorized Anderson to obtain the money upon said checks. They did nothing, neither did they omit to do anything which they should have done, in consequence of which Anderson was enabled to obtain the money upon said checks. But for the acts of appellee Anderson could not have secured that money. We are therefore unable to discover any reason, either in law or equity, why appellants should be held to be responsible for the acts of Anderson in causing such money to be placed in bank to the credit of appellee.

We need not here discuss, at length, the legal construction or effect of bank checks in the form of those under consideration. They operate as an assignment to the payee

Slaughter v. Fay.

of so much of the drawer's money then in the hands of the bank named in the checks. That money can then be procured only by the direct and affirmative act of the payee named in the checks. In so far as the drawer of the checks is concerned, it is immaterial whether such act is performed by the payee personally, or by another who is by the payee duly authorized to perform such act. It is immaterial whether appellee indorsed said checks with his own hand or with Anderson's hand. It was, in law, his act. Taylor v. Taylor, 20 Ill. 650, 652.

If the indorsements of the name of appellee upon the checks of appellants were not legal and valid indorsements, then the Northern Trust Company would be liable, either to appellants or to the bank upon which the checks were drawn, for the amount of money it obtained upon such checks. In that event the appellee would be liable to pay to the Trust Company the amount it was thus compelled to pay. It will not, however, be contended but that as between the appellee and the Trust Company, where the checks were deposited, the indorsements were, in law, as valid and binding upon appellee as though made with his own hand. If such indorsements be valid and binding as between appellee and his bank, why are they not equally binding as between appellee and appellants? If they be sufficient to effect a transfer of the money from the bank of appellants to the credit of appellee in his bank, why are they not sufficient to protect appellants as against the claim of appellee? Appellee ought not to be permitted to repudiate the sale of the stock by Anderson to appellants, and at the same time to retain the proceeds of such sale. When the money of appellants was, by the act of appellee, taken from their bank and placed to his credit in his bank, it became his money. Upon the question of legal responsibility, it is a matter of little or no consequence to appellants how, or for what purpose, appellee personally, or by his duly authorized attorney in fact, checked the money out of his bank.

But it is contended on behalf of appellee that no part of the money obtained on these checks and deposited to his

credit in his bank remained there when he learned of Anderson's fraudulent conduct—that Anderson had checked it out for his own use—and therefore appellee is not liable therefor. This contention can not be sustained. To support this position, it is urged that Anderson was authorized to draw checks in appellee's name for appellee's use and benefit only, and was not authorized to draw such checks for his own use or benefit. That may be correct as between appellee and Anderson. It is not, however, binding as between appellee and appellants, who had no notice of this private understanding.

As to the indorsing of checks and other bills receivable, which are made payable to the order of appellee, the power of attorney authorizes Anderson in these words: "In my name to indorse checks, drafts, bills of exchange, notes and orders for deposit in said Northern Trust Company." It thus appears that as to indorsing checks, etc., the power and authority of Anderson is restricted to indorsements for deposit in said Trust Company. He was not empowered to indorse the checks in question for deposit in any other bank or for transfer to any other party. But there is in the power of attorney no restriction or limitation whatever as to the power or authority of Anderson to draw checks, or as to the use he shall make of them, or the purpose for which they shall be drawn, except that they shall be drawn upon said Northern Trust Co. That provision of said power of attorney is as follows: "I do hereby make, constitute and appoint Chas. E. Anderson to be my true and lawful attorney, for me, and in my name, to draw checks, bills of exchange and drafts, and make orders and overdrafts upon the Northern Trust Company of Chicago."

If the contention be correct that as between appellee and Anderson the latter had no authority to draw checks except for appellee's personal use or business, and if it be true that this limitation of his authority extends to and is binding upon third parties, then the Northern Trust Company Bank honored checks drawn by Anderson in the name of appellee, and charged the same to appellee's account, which it should

not have done.  If that secret limitation of Anderson's power is to be enforced, as against appellants, it must be binding upon the bank also.  If that be so, then in the eye of the law the money collected on appellants' checks and placed to the credit of appellee in his bank is still there to his credit, and he should not be permitted to keep the money after having recovered his stock.

This suit is for money had and received.  We think the form of action is well chosen.  In Taylor v. Taylor (*ante*), 20 Ill. 650, 653, it is held to be " the well recognized doctrine that the action for money had and received may be maintained whenever the defendant has obtained money of the plaintiff which in equity and conscience he has no right to retain."  Hall v. Marston, 17 Mass. 575; Pierce v. Crafts, 12 Johns. 90.

We need cite no authorities to sustain the statement that appellee is liable to third parties for the acts of Anderson, although wrongful or fraudulent as between them, if such acts are " within the scope of his (Anderson's) authority." It does not appear that appellants had any occasion to, or that they did, investigate as to Anderson's authority to indorse the checks they had given.  They were prudent and cautious enough to make the checks payable to the order of appellee.  No duty rested upon them to follow the checks and see that they were properly indorsed before any one took them.  When the Northern Trust Company took those checks, it did so at its peril as to the validity of the indorsement.  The indorsing of the checks in question by Anderson was within the scope of his authority.  Appellee, then, should not be permitted to say, "It is true Anderson was my attorney in fact, authorized to indorse my name upon checks payable to my order for deposit in my bank, but that was intended by me to apply only to checks received by him in the proper management of my business, and he willfully perverted the power vested in him to do something more than I designed or intended, and therefore I should not be liable for his acts."  T. W. & W. R. R. Co. v. Harmon, 47 Ill. 298, 308.

The case of National Bank of Las Vegas v. Oberne, 121 Ill. 25, is cited by counsel for appellee with the remark that "this case in its facts, is absolutely parallel to the case at bar." We do not so read it. In that case the precise authority of the agent does not appear. From the statements in the opinion of the court and the arguments of counsel, we understand the facts to be that Thomas Davis was at Las Vegas the agent of Oberne & Co., a Chicago firm; that when Davis made purchases there for that firm, he drew drafts on them and deposited the same in the appellant bank; that the amount of such drafts were by the bank passed to the credit of the firm; that Davis was authorized to check out of the bank only the amount or proceeds of the drafts thus drawn and deposited by him, and that he had no authority to bind Oberne & Co. by indorsement or guaranty. Davis applied to the bank to discount a promissory note which he had taken for money loaned and which was made payable to the order of Oberne & Co. The cashier of the bank wrote on the back of the note an indorsement and guaranty. To that was signed the name of Oberne's firm by said Davis, and the amount of the note was passed to the credit of the firm. The whole amount was afterward checked out upon checks signed "Oberne, Hosick & Co., per Thomas Davis." A portion of those checks were given in payment for purchases made by Davis for said firm, and a portion were for Davis' personal use. The note not being paid, the Las Vegas bank sued Oberne & Co. upon said guaranty indorsed upon said note. The holding by the Supreme Court was that Oberne & Co. were liable for that portion of the proceeds of said note which was checked out and paid by Davis for stock purchased by him and shipped to said firm, but were not liable for the portion checked out by Davis for his own use.

The Oberne case was a proceeding by the bank against the depositor. To make the case at bar parallel with that case as to parties, it should have been brought by the Northern Trust Company against Fay, the appellee. The maker of the note which Davis had guaranteed in the Oberne case

did not pay the note.  Suppose the bank upon which the appellants' checks were drawn had declined to pay them, and the Northern Trust Company had sued appellee for the amount of same, which had been passed to his credit and checked out by Anderson.  That would have made a case nearly or quite parallel to the Oberne case.  But surely it will not be contended that in the supposed case appellee could successfully interpose the objection that Anderson was not authorized to make the indorsements which were made upon the checks in question and deposit the same to appellee's credit.  The defense in the Oberne case was not based upon the fact that Davis had checked the money out improperly, but upon the fact that he had no authority to guarantee the note.  The Oberne case is not parallel to or decisive of the case at bar, as is so strenuously and repeatedly urged.

Neither is the position of appellee tenable that " It was Slaughter, and not Fay, who put it into the power of Anderson to steal this money."  It was by reason of the authority given by Fay to Anderson by the power of attorney that the latter was able to get the money into the bank to the credit of Fay.  It was by reason of the same authority conferred in the same manner that Anderson could check the money out of the bank and steal it.  If Anderson had not been vested with this authority by Fay, he could not have secured the control of the money called for by appellants' checks in any way which would have been binding upon appellants.

We are of opinion, as stated by counsel for appellants, that " the fact that appellee did not have appellants' money in his possession and control when this suit was brought, because, after it came to his possession and control, it was drawn out by Anderson acting under a power of attorney, of whose existence appellants were ignorant, is no defense to this action."

Each partner is an agent of his firm and of the other members of the firm, in the matter of the firm business.  Anderson was the agent of appellee.  The principal is

bound by the acts of the agent, within the scope of his authority, in one case as much as in the other.

The case of Marsh v. Keating, 2 Clark & Fin. 250, arose out of the notorious Fauntleroy forgeries in London in 1819. The report of the case is quite voluminous, and it is a leading case. It appears that one Fauntleroy, a member of the firm of Marsh & Co., bankers, forged a power of attorney to the firm from one of its customers named Ann Keating, by virtue of which he transferred £9,000 of annuities registered in the name of Mrs. Keating at the bank of England, and sold the same through a broker. The firm kept a bank account with Martin, Stone & Co., and the broker deposited the net proceeds of the sale of the annuities with this banking house to the credit of Marsh & Co. The money was then drawn out by Fauntleroy on checks signed by him with the firm name, and was converted to his own use. The firm of Marsh & Co. consisted of four members, neither of whom, except Fauntleroy, knew of his transactions, and they were not entered upon the books of the firm, neither did the firm receive any benefit from the transactions. The question in the case was whether Ann Keating could maintain an action for money had and received against the firm of Marsh & Co. Held, that the action could be maintained. The House of Lords, by Mr. Justice Park, said (p. 289):

" Fauntleroy, one of the partners, deceived the others by preventing the money from being ultimately brought to the account of the house; but as between them and the person by the sale of whose stock it was produced, we think the fraud of their partner, Fauntleroy, in the subsequent appropriation of the money, affords no answer after it had once been in their power."

The same question was involved in the case In re Ketchum, 1 Fed. Rep. 815. In that case it appears that the firm of Ketchum & Belknap was engaged as brokers in buying and selling stocks for customers. Belknap was intrusted individually for safe keeping with large amounts of stocks and securities belonging to Morris, kept in a tin box, of which he retained the key. Morris, the owner of

the stocks and securities, kept a deposit account in a bank, and Belknap had a power of attorney from him to check upon this account, but had no authority to draw money, except for the proper use and benefit of Morris, and no authority to use or dispose of the stocks and securities except by the order of Morris.   Belknap drew checks against the bank account, and deposited the checks to the credit of his firm, without the knowledge of his partner, and sold and disposed of some of the stocks and securities, and deposited the proceeds in the bank to the credit of his firm, and used other stocks and securities by hypothecating them for loans to his firm.   The firm failed and went into bankruptcy, and the case arose upon the right of the defrauded party, Morris, to prove his claims against the bankrupt estate of his firm.   It was objected that the claims could not be proved, because the fraudulent acts of Belknap, done without the knowledge of his partner, could not bind the firm, and that the firm received no benefit from the transactions, because Belknap drew out, for his personal uses, the moneys deposited to the credit of the firm.

The court (Choate, J.) said (p. 831, *et seq.*):

" The case of Marsh v. Keating can not, I think, be distinguished in principle from the present case.   *   *   *   That case discloses that the plaintiff was a customer of the defendants' firm, but the liability of the defendants is not rested at all, on any fiduciary relation between the firm and the plaintiff, as respects her stocks, but wholly, as it seems, on the receipt of her money.   *   *   *   The point made by the opposing creditors, that F. M. Ketchum, or the firm, is not liable, because Belknap, after the deposit of these moneys, drew out all or some of them for his own personal uses, is untenable.   If, by the receipt of the money, the firm was made chargeable with it, it is no answer that the firm was afterward robbed of it or a part of it; much less that a member of the firm, being authorized to draw checks on the firm's bank account, abused that authority by drawing for purposes not authorized by the agreement between the partners."

Counsel for appellants requested the trial court to give to the jury several instructions, but the court refused to pass

upon said instructions, and refused to give them or either of them to the jury, and instructed the jury that appellants were not entitled to recover, and to find a verdict for the appellee. The second and third of said instructions are as follows, viz.:

2. "If the jury believe from the evidence that the defendant's bank account was permanently benefited by the money obtained by Anderson from the plaintiffs, they will find and render a verdict in favor of the plaintiffs and against the defendant for the amount of such benefit as found by them from the evidence."

3. "If the jury believe from the evidence that Anderson, claiming to act as the agent of the defendant, obtained money from the plaintiffs upon the sale or pledge of the shares of stock in the Chicago Edison Company mentioned in the evidence, with indorsements of said defendant upon their back, which indorsements had been previously forged by said Anderson, and that said Anderson used portions of such moneys so obtained to replace moneys previously embezzled by him from said defendant, and the balance of such moneys or some portions thereof for the use and benefit of said Fay in his legitimate business, then the jury are instructed that said defendant is liable to said plaintiffs in this action for so much of such moneys as were used by said Anderson to replace money previously embezzled by him from said defendant, and also for so much of the balance thereof as was used by said Anderson for the use and benefit of said defendant in his legitimate business."

There is testimony tending to show, and which it is contended by appellants conclusively establishes, that a portion of the money collected upon the checks given by appellants was paid and used for appellee's benefit and to pay his debts. If it be true that a portion of that money was so used, then appellants were entitled to recover the same from appellee, because it was so used, without regard to the question of whether it came rightfully into the bank to the credit of appellee. See the Oberne case, *ante* (121 Ill. 25). The jury should have been instructed upon this point and should have been permitted to determine what the facts are in that regard.

But we prefer to place our decision upon the main ques-

tion that it was error to instruct the jury that appellants are not entitled to recover, and to direct them to find a verdict for the appellee.

The judgment of the Superior Court is reversed and the cause remanded.